UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION


CORY B. LANGE,                          )
                                        ) Cause No.
          Plaintiff,                    ) 4:20-cv-0160-TWP-KMB
                                        ) Indianapolis, Indiana
     vs.                                ) **August 27, 2024**
                                        ) 1:14 p.m.
ANCHOR GLASS CONTAINER                  )
CORPORATION,                            )
                                        ) **VOLUME I**
          Defendant.                    )


**Before the Honorable**
**TANYA WALTON PRATT**

OFFICIAL REPORTER'S TRANSCRIPT OF
JURY TRIAL


**For Plaintiff:**                      Stephen E. Imm, Esq.
                                        Diana L. Emerson, Esq.
                                        Finney Law Firm
                                        4270 Ivy Pointe Boulevard
                                        Cincinnati, OH  45245


**For Defendant:**                      Christopher C. Murray, Esq.
                                        Ellen Pactor, Esq.
                                        Ogletree, Deakins,
                                         Nash, Smoak & Stewart
                                        Suite 2700
                                        300 North Meridian
                                        Indianapolis, IN  46204



Court Reporter:                         David W. Moxley, RMR, CRR, CMRS
                                        United States District Court
                                        46 East Ohio Street, Room 340
                                        Indianapolis, Indiana  46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
TRANSCRIPT CREATED BY COMPUTER-AIDED TRANSCRIPTION

## **I N D E X**

Opening statement by Mr. Imm  .................37

Opening statement by Mr. Murray  ..............54

Vol. 1-3

1          (In open court.)

2          THE COURT:  You may be seated.  Good afternoon.  We

3   are on the record.  This is Cory B. Lange versus Anchor Glass

4   Container Corporation, and we are scheduled to begin our jury

5   trial this afternoon.  And, so, lawyers, what we're going to do

6   right now is handle the objections that were filed over the

7   weekend and, I guess, yesterday.

8          Let's begin by having counsel state your names for the

9   record, and I notice -- is your client here?

10         MR. IMM:  My client is on his way, Your Honor.  I'm

11  sorry.  The only time we saw in the Court's order was 1:30.  He

12  should be here momentarily --

13         THE COURT:  Okay.

14         MR. IMM:  -- but he will be here.

15         THE COURT:  Okay.  All right.  Let's state your names

16  for the record, beginning with Plaintiff's counsel.

17         MR. IMM:  Stephen Imm on behalf of Cory Lange, Your

18  Honor.

19         MS. EMERSON:  Diana Emerson on behalf of Cory --

20         THE REPORTER:  I can't hear.

21         THE COURT:  We can't hear you.

22         MS. EMERSON:  Diana Emerson --

23         THE COURT:  You have to cut your microphone on.

24         MS. EMERSON:  Diana Emerson for Cory Lange.

25         THE COURT:  Okay.  Does she have a mic?

1          MS. EMERSON:  Yes.  Yes, Your Honor.

2          THE COURT:  All right.

3          All right.  And at our Defendant's table?

4          MR. MURRAY:  Good afternoon, Your Honor.  Chris Murray

5     on behalf of Defendant.

6          THE COURT:  Mr. Murray.

7          MS. PACTOR:  Ellen Pactor on behalf of Defendant.

8          THE COURT:  Okay.

9          MR. HIJAB:  And I'm Sam Hijab, H-I-J-A-B, with Anchor

10    Glass Container Corporation.

11         THE COURT:  You're counsel, also?

12         MR. HIJAB:  Internal counsel.

13         THE COURT:  Okay.  All right, lawyers, so let's talk

14    about the Defendant's limited objections to the Court's

15    preliminary jury instructions, because we're going to read

16    those today.  That's at Docket 186, and Defendant counsel, you

17    object to preliminary instruction number 7.  That's the

18    instruction that states, as the Court has it:  "You should not

19    be influenced by any person's race, color, religion, national

20    ancestry, or sex."  What's your objection to that, counsel?

21         MR. MURRAY:  Yes, Your Honor.  Only that -- I guess

22    two things, Your Honor.  It's not part of the standard

23    objection unless there's a specific reason for including it,

24    but that's not necessarily an issue.  But more just in the --

25    because this is a race discrimination case, the possibility

1    that it could be confusing to the jury, because at some point

2    there may be some testimony from witnesses about somebody was

3    this race or that race, and we wouldn't want the jury to infer

4    that they were doing something improper by referencing

5    someone's race throughout the case, Your Honor.

6        We had suggested some alternative proposed language

7    that they just don't consider race in applying the law to the

8    facts or in deciding the facts, but that's our suggestion, Your

9    Honor.  Thank you.

10        THE COURT:  What's your position, counsel?

11        MR. IMM:  Candidly, Your Honor, I don't understand the

12    objection --

13        THE REPORTER:  I'm sorry.  Do you have your microphone

14    on?

15        MR. IMM:  Are we supposed to have lapel mics?

16        THE REPORTER:  Yes.

17        THE COURT:  Yes.  You need to wear your lapel mics.

18        MR. IMM:  I'm sorry.

19        THE COURT:  And the court reporter's preference is

20    that even when you're speaking in a stationary mic, and at the

21    lectern, that you also wear your lapel mics, because we all

22    want an excellent record, and we want to make sure he hears

23    every single word.

24        MR. IMM:  Is this good?  Is this mic working?

25        THE COURT:  It's working.

1          MR. IMM:  Okay.  Great.

2          I was saying, Your Honor, I don't really understand

3     Defendant's objection.  It's certainly -- instruction number 7

4     sounds like a correct statement of law to me, so I don't think

5     the objection is well-taken.

6          THE COURT:  I think his objection is, is he saying

7     that -- the committee comments say that the bracketed material

8     should not be given unless a party has a legitimate concern

9     about the possibility of influence by one or more of these

10    factors, and I believe in a race case, these are factors.  And

11    personally, I give it in every single trial, because we don't

12    want, ever want a juror to consider anything inappropriate such

13    as a person's race, religion, national ancestry, or their sex.

14         So I'm going to give the pattern with that included,

15    and do you have any objection to Defendant's counsel wants to

16    add -- what's the language you want to add?

17         MR. MURRAY:  Yes, Your Honor.  I think my recollection

18    is just adding that -- well, that particular instruction, I

19    think, is about informing the jury that they're responsible for

20    deciding the facts.  So we would just suggest adding the phrase

21    should not consider those factors in deciding the facts or

22    applying -- or deciding the facts, I think.  I'm going from

23    memory, Your Honor, so I'm sorry.

24         THE COURT:  Yes.  You have in deciding -- you want to

25    say, you should not be influenced by any person's race, color,

1    religion, national ancestry, sex -- or sex in deciding the

2    facts or in applying the law to these facts.  I don't know if

3    that's a correct statement of the law.

4            MR. IMM:  I don't either, Your Honor.  I think in a

5    race discrimination case, the parties are going to have to

6    consider -- those jurors are going to have to consider race.

7            THE COURT:  Race.  And what this instruction is saying

8    is to not -- perform these duties fairly and impartially, to

9    just not unfairly or impartially consider those factors.  So

10   over Defendant's objection, I'm going to give the pattern,

11   including the bracketed section about race and gender.

12           All right.  And then your other objection is to

13   instruction number 8, and this is the direct and circumstantial

14   evidence.  And you just want me to give the full pattern

15   instead of this abbreviated version?

16           MR. MURRAY:  Yes, Your Honor.  That would be our

17   request.  Thank you.

18           THE COURT:  Do you have any objection about that,

19   Mr. Imm?

20           MR. IMM:  No, Your Honor.

21           THE COURT:  All right.  So we'll give the pattern.

22   Okay.  All right.  Anything else that we need to talk about?

23   The jury will be here in about 10 minutes.  Anything else

24   before we bring in the panel, from the Plaintiff?  You've just

25   got to get your client here.  You've talked to him, and he is

1  on his way?

2        MR. IMM:  Yes.

3        THE COURT:  Okay.

4        MR. IMM:  I spoke to him just moments ago, Your Honor.

5        THE COURT:  Okay.

6        MR. IMM:  But inasmuch as opening statements may want

7  to reference some of these individuals that are subject to the

8  pending motions in limine, I was wondering if the Court was in

9  a position to make any rulings on those.

10        THE COURT:  I will be before we do opening; okay?

11        MR. IMM:  Very well.  Thank you, Your Honor.

12        THE COURT:  So I have a draft.  I've just got to

13  review it before I issue it; okay?

14        MR. IMM:  Thank you, Judge.

15        THE COURT:  All right.  Anything else from the

16  Defendants?

17        MR. MURRAY:  Not from the Defendant.

18        THE COURT:  So what we'll do, lawyers, we'll select

19  our jury, and then we'll take a break.  And I'll get you the

20  rulings on those motions in limine, and then I will read the --

21  I read the preliminary instructions first.  And then you guys

22  will make your opening statements, and then we'll be able to

23  come back tomorrow and start straight with evidence.  And that

24  way we can ensure that we're finished by Friday.

25        MR. MURRAY:  Thank you, Your Honor.

1          THE COURT:  Okay.  All right.  Is this your client?

2          MR. IMM:  Yes, Your Honor.  Yes.

3          THE COURT:  Okay.

4          MR. IMM:  Cory, come on up.

5          THE COURT:  All right, lawyers.  We'll take a recess

6     for ten minutes, and the panel should arrive by that time.

7          MR. MURRAY:  Thank you, Your Honor.

8          THE COURT:  Okay.  We'll see you in a few minutes.

9          COURTROOM DEPUTY:  All rise.

10       (Recess at 1:22, until 1:46.)

11         THE COURT:  You may be seated.  Good afternoon,

12    everyone.  My name is Tanya Walton Pratt, and I am the chief

13    judge of the United States District Court for the Southern

14    District of Indiana.  And you all are here this afternoon

15    because we're going to select a jury for a trial that's going

16    to actually begin the evidence tomorrow, but we wanted to make

17    sure we had our trial finished before the Labor Day weekend, so

18    we're starting with our jury selection this afternoon.  And I

19    will be the judge presiding over the trial.

20         I want to begin by thanking all of you, those of you

21    in the box and in the audience for being here today and

22    responding to your summons.  We all know that it is a sacrifice

23    for you to come in and perform your jury duty, and it's a

24    financial sacrifice, and certainly it's one of your time, so I

25    want to thank all of you for being very good citizens and

1   reporting this afternoon.

2           In just a moment all of you will be asked to take an

3   oath or affirmation that your answers this afternoon will be

4   truthful.  Thereafter, I will ask a number of questions

5   addressed to all of you as a group.  If you desire to answer

6   yes to any of these questions, you should raise your paddle at

7   the time that the question is asked, and after I have

8   questioned you, the attorneys will have a brief opportunity to

9   ask some supplemental questions.

10          Ladies and Gentlemen, these questions are not intended

11  in any way to be personal, prying, or offensive, but rather

12  they're necessary to ensure that a panel of fair and impartial

13  persons for this particular matter can be selected.  If any of

14  you had prior knowledge of any of the parties in this case or

15  had any biases to one of the issues in the case, you would

16  understand that you may not be the proper person to serve on

17  this particular jury.

18          So I need all of you, all my prospective venire

19  persons to please stand, out in the audience and in the box,

20  and raise your right hands.  I'm going to ask you to take an

21  oath or affirmation that your answers this afternoon will be

22  truthful.

23      (The prospective jurors are sworn.)

24          THE COURT:  You may be seated.

25          All right, Ladies and Gentlemen, everybody take a deep

1    breath because you look nervous.  Just take a deep breath, and

2    I promise you, people who have served on a jury always in the

3    end, they say it's a very rewarding experience.  So you guys

4    are going to have a very rewarding experience.

5         The matter that's going to be tried is a civil case as

6    opposed to a criminal case, and it is entitled Cory B. Lange,

7    Plaintiff, versus Anchor Glass Container Corporation, the

8    Defendant.  Throughout the trial proceedings, the parties will

9    likely refer to the Plaintiff, Cory Lange, as either the

10   Plaintiff or Mr. Lange.  And we will likely refer to the

11   Defendant, Anchor Glass Container Corporation, as either Anchor

12   Glass or Anchor or the Defendant.

13        Ladies and Gentlemen, Mr. Cory B. Lange is in the

14   courtroom.

15        Mr. Lange, would you stand up so they can get a look

16   at you.  And would you turn around so those in the audience can

17   see you, also?

18        Thank you.  You may be seated.

19        Is anyone personally familiar with or related in any

20   way to Cory B. Lange?  Does anyone know Mr. Lange?  If so,

21   raise your paddle.

22        All right, very good.

23        And Anchor Glass Container Corporation is a glass

24   manufacturing company located in Lawrenceburg, Indiana.  I

25   believe their corporate headquarters are in Tampa, Florida; am

1    I correct, Counsel?

2            MR. MURRAY:  That's correct, Your Honor.

3            THE COURT:  All right.  Are any members of the panel

4    familiar with Anchor Glass Container Corporation?

5            Okay.  Ladies and Gentlemen, this is a civil case, as

6    I stated, and Mr. Lange's claim is a claim for race

7    discrimination.  So this is a civil rights claim, and it's

8    pursuant to a federal statute.  That statute is 42 -- Title 42

9    United States Code, Section 1981.  So the issue for the trial

10   will be whether Anchor Glass unlawfully discriminated against

11   Cory Lange because of his race when they failed to hire him.

12           The lawyers in this matter not only represent

13   particular parties in this case, but the lawyers are also

14   officers of this court.  They have spent many, many months

15   preparing this case in order to present evidence from which a

16   jury will try to reach a unanimous verdict.

17           At this time I'm going to introduce to you the

18   attorneys involved in this case.  Representing the Plaintiff,

19   Plaintiffs are attorney Stephen E. Imm, and Mr. Imm, why don't

20   you stand up and introduce the people -- your co-counsel and

21   let them know where your law firm is located.

22           MR. IMM:  Thank you, Your Honor.  I'm with the Finney

23   law firm.  My colleague, Diana Emerson, is, as well.  And we

24   practice in Cincinnati, Ohio.

25           THE COURT:  Okay.  Thank you.

1          All right, Ladies and Gentlemen, is anyone familiar

2      with either attorney Imm -- is it pronounced Imm?

3          MR. IMM:  Actually Imm, Your Honor.

4          THE COURT:  Imm.  Okay.  It was spelled I-M-M.  I'm

5      sorry, Imm, and Attorney Emerson.  Anyone familiar with either

6      of these attorneys?

7          All right.  Very good.

8          And representing the Defendant, I think lead counsel

9      is Christopher C. Murray.  And Mr. Murray, would you introduce

10     the persons at your table and your law firm.

11         MR. MURRAY:  Sure.  Good afternoon.  My name is Chris

12     Murray, and I'm with a law firm called Ogletree, Deakins, and

13     we're based here.  We're located here in Indianapolis, and my

14     colleague is Ellen Pactor.  She's another lawyer with me at the

15     firm.  Thank you.

16         THE COURT:  All right.  Does any member of the panel

17     have any personal knowledge or familiarity with either Attorney

18     Murray or Attorney Pactor with the law firm of Ogletree -- is

19     it still Ogletree, Deakins, Nash, Smoak & Stewart?

20         MR. MURRAY:  Yes, Your Honor.  That's the whole

21     mouthful.

22         THE COURT:  All right.  Anyone familiar with that law

23     firm or these lawyers?

24         Okay, very good.

25         All right, Ladies and Gentlemen, I'm going to

1    introduce the people that are going to be assisting me during

2    the trial.  To my left is my judicial law clerk, Alex Avtgis.

3    Stand up, Alex, so they can get a good look at you.  And so my

4    law clerk will be -- he will do whatever I need him to do to

5    assist me during the trial.  If I need any issues researched or

6    anything of that nature, that's what Alex will take care of.

7    Thank you, Alex.  You may have a seat.

8            And to my right is my courtroom deputy clerk, Sarah

9    Haltom, and Sarah serves as the official bailiff.  So she's the

10   person that will bring -- she will take care of the jury during

11   the trial.  She'll bring you in and take you out.  She will

12   take care of any needs that any person has on the panel, and if

13   you do have a personal problem or some issues, you need to

14   deliver them to Sarah, and she will make sure that I get the

15   message.

16           Also assisting me is one of my law clerks, Carly

17   Tebelman, and that's Carly.  And Carly is going to be assisting

18   by passing the microphone, because the next person I'm going to

19   introduce you to is my court reporter, David Moxley.  And

20   Mr. Moxley is not able to stand up because he's doing something

21   called computer-assisted transcription.  So he is actually

22   giving me a realtime transcript of everything that's said in

23   the courtroom.

24           Every word that's spoken in this court of record is

25   taken down.  So whether I'm talking or the lawyers or the

1    witnesses or you guys, it is being recorded.  And even though

2    Mr. Moxley is a very good court reporter, he's not perfect.

3            So when the jury is deliberating, they will not have a

4    transcript, and they will not have the assistance of a

5    transcript during their deliberations, so that's why it's very

6    important that the jury pay close attention to the evidence

7    that comes from the witness stand, and the jury will be allowed

8    to take notes, because you'll have to make decisions based on

9    your recollection of the testimony and evidence and not with

10   the aid of a transcript.

11           Ladies and Gentlemen, during the trial, witnesses will

12   be examined over here at the witness stand, and then they will

13   be cross-examined.  And I'm going to read to you the names of

14   possible witnesses that may be called to testify.  Those names

15   are Katie Petty -- is it pronounced Terron or Terron?

16           MR. IMM:  I believe Terron, Your Honor.

17           THE COURT:  Terron Gregg, Brad Lange, Travis Ross,

18   Eric Gosmeyer, Lindsay Glacken, Laura Distefano, Lisette

19   Davila, and Malcolm, also known as Mike, Whiting -- or is that

20   Whiting?

21           MR. MURRAY:  Whiting, Your Honor.

22           THE COURT:  Whiting.  All right.  So those are

23   possible witnesses that may be called to testify.  And, of

24   course, the Defendant, Cory B. Lange.  Does anyone know any of

25   those persons?  Is anyone familiar with the names of any of the

1    possible witnesses that may be called to testify in this

2    matter?  All right.  Very good.

3         All right, Ladies and Gentlemen, the next phase of our

4    trial is the actual voir dire examination, where I will ask

5    specific questions to those in the box.  The term "voir dire"

6    is both a Latin and a French phrase, and it means speak the

7    truth.

8         It is a very important civic duty to serve on a jury.

9    It goes along the lines of your right to vote and your duty to

10   serve in the military when called upon.  As I stated earlier,

11   you are all very good citizens because you have responded to

12   your summons, and this is part of your civic duty.

13        Now that we have you in the courtroom, there are two

14   ways that you may be excused.  One is through a challenge for

15   cause, and the other is through peremptory challenges.  A

16   challenge for cause is if there's a legal or statutory reason

17   why you should not serve, such as age.

18        You have to be at least 18 years old.  You have to be

19   able to understand the English language.  You have to be a

20   resident of the Southern District of Indiana, and so those are

21   the ways you can get -- be excused for a challenge for cause.

22        And then the other way are through peremptory

23   challenges, and these peremptory challenges, each party is

24   given a certain number of strikes or challenges that they can

25   pretty much use at their discretion, and the lawyers use those

1    to help them arrive at a panel of persons, again, who can be

2    fair and impartial in this particular matter.  And the lawyers

3    don't have to give a reason for the peremptory challenges, but

4    it's just so that the lawyers can feel that they have a panel

5    that will be fair.

6         The good news is that from our panel -- I believe we

7    have 22 -- is that right, Sarah?

8         COURTROOM DEPUTY:  That's correct.

9         THE COURT:  Twenty-two persons.  We'll only be

10   selecting eight of you to serve as jurors.  In a criminal

11   trial, if you have been on a criminal trial, if you've seen

12   them on television, you have to have 12 jurors.

13        In a civil trial, you have to have at least six, and

14   so we're going to have eight.  And just in case somebody gets

15   sick or something happens, because, you know, there's been an

16   outbreak of COVID in the community, things happen.  So we're

17   going to have a jury of eight who will have to render a

18   unanimous verdict.  So they will decide the disputed issues of

19   fact.

20        This case, Ladies and Gentlemen, as I talked about

21   earlier, it's going to last no more than three and a half days.

22   We will finish no later than Friday of this week.  We'll take

23   an, about an hour for lunch on the full days, and you will get

24   a break in the morning and afternoon.  This is not a

25   sequestered jury, so you get to go home at night.

1          You may communicate with your employers and your

2     families and let them know that you're on jury duty, but you're

3     not allowed to tell them about what's happening in your trial.

4     And the only time you're not allowed to communicate with the

5     outside world is during deliberation.  When the jury

6     deliberates, we'll take your cell phones, we'll give you a very

7     comfortable jury room with lots of snacks and keep you

8     comfortable so that you can get to the business of deliberating

9     and reaching a verdict.

10        (Voir Dire examination was recorded but is contained under

11         separate cover.)

12        (Jury in at 3:17.)

13          THE COURT:  Number 35, I am going to excuse you.  So

14    thank you very much for your service, also.  Go that way.

15    Thank you.

16          All right, so you are the one, two, three, four, five,

17    six, seven, you're the eight jurors.  Would you please stand,

18    and I'm going to get you sworn in.  And raise your right hands.

19        (The jury is sworn.)

20          THE COURT:  You may be seated.  All right, Ladies and

21    Gentlemen, I'm going to give you your preliminary instructions

22    on the law, and then we're going to take a little break and let

23    the lawyers get set up.  And they're going to give you their

24    opening statements, and then we're going to send you home.  And

25    when you come back in the morning you'll begin to hear evidence

1    and testimony, and as I give these instructions, you can

2    following along on the screen or you can just sit back and

3    listen.

4        Ladies and Gentlemen of the Jury, you are now the jury

5    in this case, and I want to take a few minutes to tell you

6    about your duties as jurors and to give you some instructions.

7    At the end of the trial, I will give you more detailed

8    instructions.  Those instructions will control your

9    deliberations.  One of my duties is to decide all questions of

10   law and procedure.

11       From time to time during the trial, and at the end of

12   the trial, I will instruct you on the rules of law that you

13   must follow in making your decision.  You should not take

14   anything I may say or do during the trial as indicating what I

15   think of the evidence or what your verdict should be.

16       The matter to be tried is a civil case.  The party who

17   filed the case is called the plaintiff.  In this case, the

18   Plaintiff is Cory B. Lange.  The party being sued in the case

19   is called the defendant.  In this case, the Defendant is the

20   Anchor Glass Container Corporation.

21       Mr. Lange, as the Plaintiff, has the burden of proving

22   his case by what is called a preponderance of the evidence.

23   Accordingly, when I say Mr. Lange must prove something by a

24   preponderance of the evidence or when I use the expression, "if

25   you find" or "if you decide," this is what I mean:  When you

1    have considered all the evidence in the case, you must be

2    persuaded that it is more probably true than not true.  Anchor

3    Glass has no burden to disprove Mr. Lange's claims.

4         The positions of the parties can be summarized as

5    follows:  This is a civil case.  Plaintiff Cory B. Lange has

6    filed a claim of discrimination on the basis of race against

7    the Defendant, Anchor Glass Container Corporation.  The

8    Defendant, Anchor Glass Container Corporation, is a glass

9    manufacturing company.

10        In March 2018, Mr. Lange applied for a selector/packer

11   position at Anchor Glass Container Corporation.  Anchor Glass

12   Container Corporation did not hire him.  Mr. Lange claims that

13   Anchor Glass Container Corporation did not hire him because he

14   is African-American.  Anchor Glass Container Corporation denies

15   Mr. Lange's claim.

16        To prove his discrimination claim, Mr. Lange will have

17   to prove, by the preponderance of the evidence, that Anchor

18   Glass Container Corporation did not hire him because of his

19   race.  Again, this is a summary of the parties' positions.  You

20   will be instructed on all of the elements of proving these

21   claims in your final instructions.

22        The evidence consists of the testimony of the

23   witnesses, the exhibits admitted in evidence, and any facts

24   that I may instruct you to find or the parties may agree or

25   stipulate to.  A stipulation is an agreement between both sides

1    that certain facts are true.  During the trial, you may hear me

2    use terms that you have heard before.  I will briefly explain

3    some of the most common terms to you.

4         You may hear me refer to Cory B. Lange as Plaintiff.

5    Again, the party who filed a case is called the Plaintiff.  You

6    may hear me refer to Anchor Glass Container Corporation as a

7    Defendant.  Again, the party being sued is the Defendant.  You

8    may hear me refer to counsel.  Counsel is another way of saying

9    lawyer or attorney.  I may sometimes refer to myself as the

10   Court.

11        When I say sustain an objection, I am excluding that

12   evidence from the trial for a legal reason.  When you hear that

13   I have overruled an objection, I am permitting that evidence to

14   be admitted.  If -- when I say admitted into evidence or

15   received into evidence, I mean that the particular statement or

16   particular exhibit may be considered by you in making the

17   decisions you must make at the end of the case.

18        You will have to decide whether the testimony of each

19   of the witnesses is truthful and accurate, in part, in whole,

20   or not at all.  You also have to decide what weight, if any,

21   you give to the testimony of each witness.

22        You have two duties as a jury.  Your first duty is to

23   decide the facts from the evidence in the case.  This is your

24   job and yours alone.  Your second duty is to apply the law that

25   I give you to the facts.  You must follow these instructions

1    even if you disagree with them.  Each of the instructions is

2    important, and you must follow all of them.  Perform these

3    duties fairly and impartially.  Do not allow sympathy,

4    prejudice, fear, or public opinion to influence you.  You

5    should not be influenced by any person's race, color, religion,

6    national ancestry, or sex.

7         You have heard the phrases "direct evidence" and

8    "circumstantial evidence."  Direct evidence is proof that does

9    not require an inference, such as the testimony of someone who

10   claims to have personal knowledge of a fact.  Circumstantial

11   evidence is proof of a fact or a series of facts that tends to

12   show that some other fact is true.

13        As an example, direct evidence that it is raining is

14   testimony from a witness who says, "I was outside a minute ago,

15   and I saw it raining."  Circumstantial evidence that it is

16   raining is when the observation of someone entering a room

17   carrying a wet umbrella.  The law makes no distinction between

18   the weight to be given to either direct or circumstantial

19   evidence.

20        You should give -- you should decide how much weight

21   to give any evidence.  In reaching your verdict, you should

22   consider all the evidence in the case, including the

23   circumstantial evidence, because the law does not say that one

24   is better than the other.

25        You should use your common sense in weighing the

1    evidence and consider the evidence in light of your own

2    observations in life.  In our lives, we often look at one fact

3    and conclude from it that another fact exists.  In law, we call

4    this inference.  A jury is allowed to make reasonable

5    inferences.  Any inference you make must be reasonable and must

6    be based on the evidence in the case.

7         The following things are not evidence, and you must

8    not consider them as evidence in deciding the facts of this

9    case.  The attorneys' statements, arguments, objections, and

10   questions -- objections of the attorneys, any testimony that I

11   instruct you to disregard, and anything you may see or hear

12   when the court is not in session, even if what you see or hear

13   is done or said by one of the parties or by one of the

14   witnesses.

15        Furthermore, a particular item of evidence is

16   sometimes received for a limited purpose only.  That is, it can

17   only be used by you for one particular purpose and not any

18   other purpose.

19        One second.

20        THE COURTROOM DEPUTY:  All rise.

21     (Recess at 3:26, until 3:28.)

22        THE COURT:  Excuse me, Ladies and Gentlemen.

23        Okay, we're on number ten.  The following things are

24   not evidence, and you must not consider them as evidence in

25   deciding the facts of this case:  The attorneys' statements,

1    arguments, questions, and objections of the attorneys, any

2    testimony that I instruct you to disregard, and anything you

3    may see or hear when the Court is not in session, even if what

4    you see or hear is done or said by one of the parties or by one

5    of the witnesses.

6          Furthermore, a particular item of evidence is

7    sometimes received for a limited purpose only.  That is, it can

8    be used by you only for one particular purpose and not any

9    other purpose.  I will tell you when that occurs and instruct

10   you on the purposes for which the item can and cannot be used.

11   You should also pay particularly close attention to such an

12   instruction because it may not be available to you in writing

13   later in the jury room.

14         And, Sarah, I'm going to have you read these; okay?

15   Because I'm choking for some reason.

16         COURTROOM DEPUTY:  From time to time during the trial,

17   the judge may be called upon to make rulings of law on

18   objections or motions made by the lawyers.  You should not

19   infer or conclude from any ruling or other comments she may

20   make that she has any opinions about how you should decide this

21   case.  And if she should sustain an objection to a question

22   that goes unanswered by a witness, you should not guess or

23   speculate what the answer might have been, and you should not

24   draw any inferences or conclusions from the question itself.

25         At times during the trial, it may be necessary for the

judge to talk with the lawyers out of your hearing by using the

listen/talk devices or by calling a recess.  They meet often

because during a trial something comes up that does not involve

the jury.  We will, of course, do what we can to keep the

number and length of these conferences to a minimum, but you

should remember the importance of the matter you are here to

determine and should be patient even though we may need to

confer outside of your presence.

Any notes you take during this trial are only aids to

your memory.  The notes are not evidence.  If you do not take

notes, you should rely on your independent recollection of the

evidence and not be unduly influenced by the notes of other

jurors.  Notes are not entitled to any greater weight than the

recollections or impressions of each juror about the testimony.

When you leave the courthouse during the trial, your

notes should be left in the jury room.  When you leave at

night, your notes will be secured and not read by anyone.  At

the end of the trial, your notes will be destroyed, and no one

will be allowed to read the notes before they are destroyed.

Pay close attention to the testimony as it is given.

At the end of the trial, you must make your decision based on

what you recall of the evidence.  You will not have a written

transcript to consult.

You may submit questions to witnesses to clarify their

testimony during trial under certain conditions.  If you feel

the answer to your question would be helpful in understanding

this case, you should raise your hand after the lawyers have

completed their examinations, but before the witness is

excused.

The judge will have you write your question and hand

it to the clerk.  The judge will then privately confer with the

lawyers about the question and make a ruling on whether the law

allows the question to be asked of that witness.  If the

question is of the type that is allowed, the judge will address

the question to the witness.  Please do not directly speak to

the judge, the plaintiff, the defendant, the lawyers, or the

witnesses, but carefully follow this procedure if you wish to

have a specific question addressed to a witness.

During the trial, the judge may sometimes ask a

witness questions.  Do not assume that because she asks

questions, she holds any opinion on the matter she asks about

or on how the case should be decided.

Now to be discussed are several rules of conduct that

you must follow as jurors.  First, you should keep an open mind

throughout the trial.  Do not make up your mind about what your

verdict should be until after the trial is over, you have

received the judge's final instructions on the law, and you and

your fellow jurors have discussed the evidence.  Your verdict

in this case must be based exclusively on the law as the judge

gives it to you and the evidence that is presented during the

trial.  For this reason, and to ensure fairness to both sides
in this case, you must obey the following rules.  These rules
apply both when you are here in court and when you are not in
court.  They apply until after you have returned your verdict
in this case.

One, you must not discuss the case, including anyone
who is involved in the case, among yourselves until you go to
the jury room to deliberate after the trial is completed.

Two, you must not communicate with anyone else about
this case, including anyone who is involved in the case, until
after you have returned your verdict.

Three, when you are not in the courtroom, you must not
allow anyone to communicate with you about the case or give you
any information about the case or about anyone who is involved
in the case.  If someone tries to communicate with you about
the case or someone who is involved in the case when you are
not in the courtroom, or if you overhear or learn any
information about the case or someone involved in the case when
you are not in the courtroom, you must report this to the judge
promptly.

You may tell your family and your employer that you
are serving on a jury so that you can explain that you must be
in court.  However, you must not communicate with them about
the case or anyone who is involved in the case until after you
have returned your verdict.

1          Number five, all the information that you will need to

2    decide the case will be presented here in court.  You may not

3    look up, obtain, or consider information from any outside

4    source.  There are two reasons for these rules.  First, it

5    would not be fair to the parties in the case for you to

6    consider outside information or communicate information about

7    the case to others.  Second, outside information may be

8    incorrect or misleading.

9          When it is said that you may not consider or obtain

10   any information from outside sources and may not communicate

11   with anyone else about the case, this is referring to any and

12   all means by which people communicate or obtain information.

13   This includes, for example, face-to-face conversations, looking

14   things up, doing research, reading, watching, or listening to

15   reports in the news media and any communication using any

16   electronic device or media such as telephone, cell phone,

17   tablet, computer, the Internet, text messaging, e-mails, chat

18   rooms, blogs, social networking sites like Facebook, YouTube,

19   X, Instagram, LinkedIn, or any other form of communication at

20   all.  If you hear, see, or receive any information about the

21   case by these or any other means, you must report that

22   immediately.

23      The trial will proceed in the following manner:

24      First, Plaintiff's attorney will make an opening statement.

25   Next, the Defendant's attorney may make an opening statement.

 1    An opening statement is not evidence but is simply a summary of

 2    what the attorney expects the evidence to be.  After the

 3    opening statements, the Plaintiff will call witnesses and

 4    present evidence.  Then the Defendant will have an opportunity

 5    to call witnesses and present evidence.

 6         After the parties' main cases are completed, the Plaintiff

 7    may be permitted to present rebuttal evidence, and Defendant

 8    may be permitted to present surrebuttal evidence.  After the

 9    evidence has been presented, the attorneys will make closing

10    arguments, and the judge will instruct you on the law that

11    applies to the case.  After that, you will go to the jury room

12    to deliberate on your verdict.  I thank each of you for your

13    patience and attention.

14         We will now hear the opening statements from the

15    Plaintiff's and the Defendant's lawyers.

16              THE COURT:  Thank you very much, Sarah.

17              So, Ladies and Gentlemen, we're going to send you to

18    your jury room for a brief few minutes so that the lawyers can

19    get set up for their opening statements, and then you will hear

20    the opening statements and then we are going to send you home

21    for the evening.  So we'll have you back in the courtroom very

22    shortly.

23              THE COURTROOM DEPUTY:  All rise.

24         (Jury out at 3:38.)

25              THE COURT:  Okay, lawyers, I'm going to go ahead and

give you some rulings on the motions in limine.  Anchor Glass's

motion in limine at Docket 183, Anchor Glass moves to bar

evidence regarding the hiring of Terron Gregg, Eric Gosmeyer,

Dustin Allen, and/or Robert Wetzler, all of whom are white with

criminal convictions who were hired prior to 2018 when Anchor

Glass did not hire Mr. Lange, as well as any evidence regarding

employees other than those who were hired by human resources --

resource specialist Petty.

Anchor Glass argues that because such employees were

hired by a different decision-maker other than Petty, they are

not similarly situated to Lange; and therefore, cannot be

considered proper comparators.  And the Court agrees with

Mr. Lange that this evidence serves a different purpose and

that it is relevant.

According to Lange, the criminal history, job

applications, and employment histories of these above-mentioned

white employees, all of whom Petty was aware of when she chose

to reject his application, casts doubt on the credibility of

Anchor Glass's explanation for his rejection contained within

his EEOC position.  Citing to Mr. Petty's -- or Ms. Petty's

resume, Mr. Lange maintains that she was the human resources

department for each of the hires and describes herself as being

responsible in that time for recruiting and new hire

processing.  He claims without, without citation, that Petty

had been in the HR department through it all and was one of

1    only two such people in Lawrenceburg's plant.

2         Petty was specifically aware of Gregg's criminal

3    background and that Petty requested background checks on

4    Gosmeyer that revealed his criminal record.  So taking all of

5    these facts together, the Court finds that Petty was cognizant

6    that the company had been hiring white applicants with serious

7    criminal backgrounds, which is relevant.

8        And the Court notes in the Seventh Circuit's decision

9    vacating the prior grant of summary judgment, which remanded

10   this case back to the Court, the Seventh Circuit did highlight

11   that the differences between Petty's testimony and the EEOC's

12   position statement that the company made have not been resolved

13   and that trial is the time to do so.

14       Mr. Lange has identified enough inconsistencies, according

15   to the Seventh Circuit, in the company's explanations about not

16   hiring him to be able to present the tribal issue of whether

17   the proffered nondiscriminatory reasons are pretext for racial

18   discrimination.  Since a reasonable jury may infer pretext from

19   the criminal history, job applications, and employment

20   histories of Gregg, Gosmeyer, Allen, and/or Wetzler, the Court

21   is going to deny Anchor's motion.  So that -- I think the

22   Seventh Circuit wants it in, so we're going to keep it in.

23       With respect to Lange's motion in limine, Mr. Lange wants

24   to bar evidence or argument regarding the hiring of Cody Grady.

25   Is that the only person you're trying to offer, Cory [sic]

1   Grady?

2           MR. IMM:  That's the only one subject to my motion,

3   yes.

4           THE COURT:  Okay.  So with respect to Cory [sic]

5   Grady, that he was hired -- he's an African-American that

6   Anchor Glass hired in September of 2018, and Plaintiff's

7   position is that this occurred after the company received

8   notice of Lange's EEOC charge of discrimination.  The thrust

9   behind Mr. Lange's motion is that Anchor Glass engaged in

10  corrective action between the time when it declined Mr. Lange's

11  application, and then it hired Grady, such that Grady's hiring

12  has no relevance to Anchor Glass's motive or intent at the time

13  that it denied Lange's application.

14          And the Court has read all of the case law, and I

15  don't reach the conclusion that Lange wishes without some

16  additional evidence that suggests either a change in hiring

17  policy or a statistical evidence that supports evidence of

18  discrimination.  So upon cursory review of the documentary

19  trial evidence that's been filed with the Court as requested,

20  at this time I cannot determine that any evidence presented at

21  trial that Anchor Glass has hired Mr. Grady after choosing

22  against hiring Mr. Lange would be inadmissible for all

23  purposes.  So for these reasons, the Court is going to deny

24  Lange's -- Mr. Lange's motion in limine.

25          Then the other objection was Anchor Glass's objection

1    to Mr. Lange's second amended final witness list, and I believe

2    your objection is that you believe Mr. Lange's counsel wants to

3    lead when -- use as leading -- leading questions for Gregg and

4    Gosmeyer.  Is that what you're asking to do?  Because he's

5    either a hostile witness, an adverse party, or a witness

6    identified by an adverse party, correct?

7         MR. IMM:  Correct, Your Honor.  We did not have the

8    opportunity to prepare a brief on that issue since the

9    objections were just filed, but yes, we believe the case law

10   plainly provides that employees of a defendant are considered

11   identified with the defendant; and therefore, the opposing

12   party should be able to examine them as on cross.  And I can

13   provide citations if the Court wishes.

14        THE COURT:  What's your citation?

15        MR. IMM:  I would call the Court's attention, first of

16   all, to *Gibbons v. The Village of Sauk Village*.  That's 2017

17   U.S. District LEXIS 179108, at paragraph 12.  It cites to the

18   Seventh Circuit case of *Ellis v. City of Chicago*, 667 F.2d 606,

19   at page 613.  The Court in *Gibbons*, Your Honor, held that

20   current employees are often treated as adverse witnesses to the

21   employer's opposing party as they are considered to be

22   identified with an adverse party.  And in citing *Gibbons* -- I'm

23   sorry, in citing *Ellis*, the Seventh Circuit case, the Court

24   there held that current officers of the defendant city were

25   considered adverse witnesses to the plaintiff, and that they

1    are identified with the adverse party.  And consistent with

2    Federal Rule of Evidence 611, the plaintiff or the opposing

3    party can treat them as adverse witnesses to the extent of

4    asking them leading questions.

5              THE COURT:  Okay.

6              MR. IMM:  One other citation I will call to the

7    Court's attention, and that is *Williams v. Bailey*, which is a

8    decision from this Court in 2023, 2023 U.S. District LEXIS

9    1222, four twos, 122229, at paragraph 24, where this Court

10   considered even former employees of the Defendant, Indiana

11   State Troopers, to be identified with an adverse party in a

12   case in which one of their fellow officers was called as a

13   witness in a 1983 trial, where a fellow officer was involved.

14             So we believe these individuals clearly fall within

15   the ambit of Federal Rule of Evidence 611, which provides that

16   cross-examination may be employed when a party calls a hostile

17   witness, an adverse party, or a witness identified with an

18   adverse party.

19             THE COURT:  Okay.  I did have -- my law clerk did pull

20   for me *Ellis v. City of Chicago*.  So I have read that case.

21   Did you have anything to add, Counsel?

22             MR. MURRAY:  Yes, Your Honor.  I know you've seen our

23   brief.  The only thing I would note, Your Honor, is Plaintiff

24   is also calling Brad Lange, who is a current employee of Anchor

25   Glass.  Obviously, Plaintiff has not identified Mr. Lange as a

1    potentially adverse witness or identified for the party despite
2    the fact that he also is a current Anchor employee.
3         So, Your Honor, I think that suggests that this is not
4    an across-the-board rule that a current employee is always to
5    be identified with his or her employer in a lawsuit, and we
6    don't know.  And I would say there's no evidence in the record,
7    to my knowledge, as to what the relationship may be, if any,
8    between Mr. Lange and Mr. Gregg and Mr. Gosmeyer.
9         They have both worked at the plant for some time, but
10   we don't know what their relationship is outside of work, if
11   they have such a relationship.  Thank you, Your Honor.
12        THE COURT:  Okay.  All right.  Well, the difference
13   with Brad Lange, we know he's not hostile or adverse, because
14   that's the Plaintiff's brother, so as I know some families it
15   might be, but I don't think that's the case here.  And so what
16   we'll do, do you know if they have a personal relationship with
17   your client?
18        MR. IMM:  They do not, Your Honor.  Mr. Gosmeyer and
19   Gregg have no relationship with Mr. Lange.
20        THE COURT:  Okay.  All right.  With that confirmation,
21   I'm going to overrule the objection.  The case law does say
22   that witnesses identified with an adverse party, and because
23   they are current employees, I'm going to allow Plaintiff to
24   lead when he calls those witnesses.
25        Okay.  All right.  So we will -- how much time do you

1    need to get ready for your opening statements?  And how much

2    time did I give them, 30 minutes per side?  Okay.  It's going

3    to be a full day of work.  So we'll take about ten minutes,

4    and you'll be ready?

5              MR. IMM:  We will.

6              THE COURT:  Okay.  We'll take a ten-minute break, and

7    then we'll be ready.

8              COURTROOM DEPUTY:  All rise.

9         (Recess at 3:50, until 4:02.)

10             THE WITNESS:  We're back on the record, Cory B. Lange

11   versus Anchor Glass Container Corporation, and Counsel, we have

12   a jury selected.  They've been sworn.  They've been given their

13   preliminary instructions, and at this time we're going to do

14   opening statements.

15             Plaintiff's counsel, are you ready?

16             MR. IMM:  Yes, Your Honor.

17             THE COURT:  Defendants ready?

18             MR. MURRAY:  Yes, Your Honor.

19             THE COURT:  Sarah, you may bring in the panel.

20             COURTROOM DEPUTY:  All rise.

21        (Jury in at 4:04.)

22             THE COURT:  Ladies and Gentlemen of the Jury, we're

23   back on the record, Cory B. Lange, Plaintiff versus Anchor

24   Glass Container Corporation, Defendant.  And at this time

25   you're going to hear the opening statements of counsel.

1    Because Plaintiff has the burden, he will go first at all

2    stages of the proceedings.

3           Mr. Imm, you may make your opening statement.

4           MR. IMM:  Thank you, Your Honor.  Am I on a timer,

5    Your Honor, for this?

6           THE COURT:  Yes, the clock is on.  I'll give you --

7    I'll let you know when you have two minutes?

8           MR. IMM:  Yeah, if you could.

9           THE COURT:  Okay.

10          MR. IMM:  I can't really see that.  Thank you.

11          THE COURT:  All right.

12          MR. IMM:  Thank you.

13                    **OPENING STATEMENT BY**:

14          MR. IMM:  Ladies and Gentlemen, thank you once again,

15   first of all, for your service.  The judge has told you that --

16   just before we went on break, the judge told you that you are

17   to decide this case on the basis of the evidence and that what

18   the attorneys say in their statements is not evidence, which is

19   exactly right.  You may be wondering then why should I listen

20   to the opening statement when the judge has told us we're

21   supposed to decide this case on the basis of the evidence, and

22   this isn't evidence?

23          Well, I'll ask you to do this:  I'm going to be making

24   a number of representations to you in my opening statement

25   about what I believe the evidence is going to show, about the

1    things that I intend to prove to you in the course of the case,

2    and I'll ask you to hold me to those representations.  And at

3    the end of the case ask yourself, did Mr. Imm and Ms. Emerson

4    prove to me the things that Mr. Imm said in his opening

5    statement he was going to prove to me?

6            And I think if the answer to that question is yes,

7    then your verdict will be for the Plaintiff.  And if I do not

8    prove to you the things that I'm about to tell you, then I

9    think your verdict will be for the Defendant.

10           The first thing I'm going to say is that I represent a

11    convicted felon.  The second thing I'm going to say is that I'm

12    extremely proud to represent this gentleman, and by the end of

13    the case I think you're going to understand why.

14           Cory was born in 1980.  He's 44-years-old.  He has one

15    sibling, a brother Brad, who you will hear from during the

16    course of the trial.  Cory and Brad had a father and then a

17    stepfather who were in the military, and so they moved around

18    quite a bit when they were young.

19           When Cory was about 11 or 12, he settled in the

20    Lawrenceburg area.  Brad is two years younger than Cory.  Cory

21    didn't do well in school.  He struggled in school.  He dropped

22    out in high school in I believe his sophomore year.  He worked

23    some low wage jobs, and he got into some legal trouble, a

24    couple of misdemeanors, but then something more serious.

25           In 2009, his criminal record culminated in a

*OPENING STATEMENT/IMM*                     Vol. 1-39

1    conviction for a felony.  He sold Oxycontin, a controlled

2    substance, and he was sent to prison.  He ultimately spent

3    three years in prison.  He got out at one point but violated

4    his probation and went back.  He spent a total of three years

5    in Branchville Prison in Indiana.

6           It was an awful experience, but it was the best thing

7    that ever happened to Cory, because it was there, in that

8    prison, that Cory committed to turning his life around, and he

9    did.  He got his GED while he was in prison, and he came to

10   appreciate it.  He had three children at the time he went away,

11   three children, and he came to appreciate how important those

12   children were to him and how much he wanted to be a good father

13   and how much he wanted to be a good role model and a good

14   example for them.

15          So when he got out of prison, he started to slowly put

16   his life back together and slowly rebuild his life.  He adhered

17   strictly to the terms of his probation, reported every month,

18   never failed a drug test, got a job, not a great job, but he

19   got a job with a temporary service working at a company called

20   Pri-Pak or Pri-Pak, which later would become Refresco.

21          He worked there as just a temporary for a year with no

22   benefits or anything, but he was dedicated to it.  He showed up

23   every day.  After a year of doing a good job, they hired him

24   permanently, and he worked there from 2013 until -- well, we're

25   going to talk about 2018, but he was there for I think a total

*OPENING STATEMENT/IMM*                    Vol. 1-40

1    of about seven or eight years.

2          He became a devoted father to his children, of whom

3    there are four.  His two lovely daughters still live with him.

4    He still supports them.  His boys are older now and out of the

5    house.  He made a good, honest living and has made a good,

6    honest living, and he has never again gotten in any trouble

7    with the law.

8          A life that could have gone down a very dark path was

9    turned around, turned around in the right direction, and was

10   turned around as a result of a personal and deep commitment

11   that Cory made when he was in that prison.  And it's a

12   commitment that he's kept to this day.

13         In 2018 he applied for employment at Anchor Glass.  I

14   think we said in voir dire, you folks said you hadn't really

15   heard about this company, but in Lawrenceburg it's pretty

16   well-known.  It's considered the best or one of the very best

17   jobs in Lawrenceburg.  It pays very well.  The benefits are

18   good.  There's a union there.  It's a very attractive job.  His

19   brother, Brad, who I've already mentioned, worked there at the

20   time.  He still does.

21         He applied for a position called selector/packer.

22   Selector/packer is an entry-level position at Anchor Glass.  It

23   ultimately leads to other positions within the company.  You'll

24   hear about the hot-end and the cold-end, and there are other

25   jobs you can do.  But just about everybody starts as a

1    selector/packer, and they hire these people in groups.  They

2    don't, typically don't hire just one guy at a time.  They

3    typically hire multiple people for this entry-level job.

4          Now, Cory obviously was cognizant of the fact that he

5    had this conviction.  He had actually applied for work at

6    Anchor Glass in 2004, and although he was initially hired, he

7    was let go about ten days in because of a misdemeanor that was

8    on his record at that time.  They hire these people on a

9    probationary basis.  So you're on probation for the first 30

10   days.  You don't go in the union right away or anything.

11         So Cory didn't even make it through his probation.  As

12   I said, he was there about two weeks back in 2004 and was let

13   go then because of the misdemeanor.  I believe the evidence

14   will be that at that time, in 2004, this company had a policy

15   against hiring people who had criminal records.

16         But Cory had -- in 2018, Cory had heard from his

17   brother and through the grapevine about an employee at Anchor

18   more recently named Terron, and this Terron, according to what

19   Cory was told, actually was a convicted felon.  So Cory said to

20   himself, all right, I'll give this a shot.  Maybe things have

21   changed.  Maybe their policies are different now.

22         By this time he had worked five solid years at

23   Refresco, which is a manufacturing facility like Anchor Glass.

24   Refresco makes beverages.  Anchor Glass makes bottles for

25   beverages.  So he had a lot of relevant experience and had done

*OPENING STATEMENT/IMM*                          Vol. 1-42

1    very well there.  He had a letter of recommendation from his

2    manager, from his boss at Refresco, and he had really, as I

3    said, put his life together.

4            So he says, I'll give it a shot.  Anchor Glass gets 11

5    applications at this time in 2018 to sift through.  They bring

6    in ten of those 11 for an interview, and Cory was one of those

7    ten that they brought in for an interview.  And he gets

8    interviewed by a panel of three managers at Anchor Glass.  You

9    will see their names on the screen:  Vinnie Cooper, Sherrie

10   Gifford, Liam Curtin, all of them managers with the company.

11           And Cory goes into that interview, and he wows them.

12   I mean, he literally wows them.  They love his personality.

13   They love his work ethic.  They love his attitude, and out of

14   the ten people who had interviews, these managers say, we got

15   four.  They say four people that we recommend, and Cory was

16   right there in the top four.

17           In fact, you will see in the evidence the interview

18   forms that were filled out by these three managers, and you'll

19   see that Cory's ratings in these interview forms were off the

20   charts and were higher than just about anybody else who was

21   being considered, including most of the four people who were

22   considered the top.  So Cory was like right at the top of their

23   recommended list.

24       Now, in fact, one of the managers, Vinnie Cooper, happens

25   to have a conversation with Brad Lange that you'll hear about

1    after the interview, and he says basically, wow, I think your

2    brother is a shoo-in.

3        Now, the managers send these recommendations to a woman

4    named Katie Petty.  Katie Petty was an HR specialist.  She had

5    been at the company since 2011.  She had been at HR since April

6    of 2014.  The three managers go to Ms. Petty, and they say, we

7    recommend these four.  But at this company, as at a lot of

8    companies, before you get hired, you have to go through some

9    processing.  You have to go through a background check, and you

10   have to pass a pre-employment physical and you have to have a

11   drug test.

12       So Katie Petty then goes about calling the four people who

13   had been recommended to tell them about these prehiring

14   procedures, and she calls Cory.  And as part of that

15   conversation she says, "We're going to be running a background

16   check on you, Cory.  Is there anything we should know about?"

17   Cory is honest and upfront and he says, "Yes," and he tells

18   them, tells her about his 2009 conviction.

19       At that point, Katie Petty is done with Cory Lange, did not

20   run the background check.  She decided, on her own, she was

21   going to overrule the recommendations of these three managers,

22   and she was not going to hire this guy.  She heard black guy,

23   criminal record, no sale.  That was the end of it.

24       Now, Cory's -- and she sends him an e-mail, says, "We're

25   going in a different direction."  And Cory suspects that it's

*OPENING STATEMENT/IMM*                          Vol. 1-44

probably because of what he said in that phone call, because

everything was sounding great up to that point.  The

interviewers loved him.  He had a lot of relevant experience.

So he starts to wonder what's going on here, and he also

knows about this guy named Terron.  He didn't even know his

last name at that point, but he knew that there are -- or he

thought he knew that there was a guy there who was a convicted

felon named Terron.  And he starts to wonder, wait a minute,

was I discriminated against?

And so he proceeds to file a -- what's called a charge of

discrimination with an agency, a federal agency called the

Equal Employment Opportunity Commission, or EEOC for short.

And, Diana, can I ask you to bring up our timeline?

So you'll see here on the screen kind of a timeline of the

key events.  The first thing, March 13 to 16, is the dates that

these interviews of the ten people took place.  It was a couple

of weeks later, Cory gets the e-mail from Ms. Petty saying he's

not hired.

He starts to wonder, wait a minute, I know this Terron guy

was hired, and he's a felon or at least I think he is, and he's

white.  Maybe this was discriminatory.  He files this, what's

called a charge of discrimination, which you'll see in the

evidence, on June 26th of 2018.

Next, on July 5 of 2018, a short time later, the EEOC sends

Ms. Petty a notice of this charge and sends it to her, to

1    Ms. Petty.  She's their contact at the company, and she gets

2    this charge stating, hey, I wasn't hired apparently because of

3    my criminal background, but I know there's a white guy there

4    named Terron who appears might have been a felon.  This might

5    be discrimination.

6        So this goes to Ms. Petty, and then on September 4th, 2018,

7    the company submits its response to that charge.  And that

8    response is going to be one of the key pieces of evidence in

9    this case.  It's called a position statement, and it was

10   presented to the EEOC by the company's lawyers.

11       Two things about this position statement:  Number 1, it is

12   the first thing that the Defendant ever said about why Cory

13   wasn't hired.  So this is when it's freshest in their minds;

14   okay?  And that's going to become important for reasons I'm

15   going to explain in a minute, because they're going to tell

16   different stories about why they didn't hire Cory later, but

17   the first thing, the first thing out of the chute that they

18   show is in this position statement.

19       The second thing I'm going to tell you about this position

20   statement is that it was clearly and unequivocally based on

21   information from Katie Petty, and why that's important is going

22   to become clear, as well.  The position statement refers again

23   and again and again to Katie Petty says this, Katie Petty knows

24   this, Katie Petty discovered this.  The position statement that

25   they submitted on September 4th of 2018 was when everything was

1    fresh in their minds, and it was based entirely on information

2    from Ms. Petty.

3        And this is what the Defendant said in that September 4,

4    2018, position statement when everything was fresh.  When they

5    were asked, the company was asked, why did Katie Petty reject

6    the manager's recommendation and not hire Cory Lange?  So when

7    it gets up here in a minute, you'll see, first of all, they

8    say, as I told you before, that he was, in fact, in the top

9    four of people recommended by the panel of interviewers.

10       The next thing it says is that Katie Petty called to ask

11   Cory and the other four -- the other three, hey, when can you

12   start?  Can you take a pre-employment physical the next day and

13   tells them, we're going to be running a background check on

14   you.  She says those three things.

15       These are all things that you do for people who you have

16   made a decision to hire.  You don't -- this company, at least,

17   the evidence will be, this company doesn't run a background

18   check on you if they haven't made the decision to hire you.

19   This company doesn't send you for a pre-employment physical and

20   drug test unless they've made a decision to hire you, but

21   they -- but Ms. Petty was asking all four of these people those

22   exact questions, indicating clearly that they were intending to

23   make offers to these four individuals.

24       So -- I'm sorry, I was hoping to have this up for you.

25   We're having...

1    Your Honor, would it be possible to pause my time briefly?

2              THE COURT:  Yes.

3              MR. IMM:  We had tested this.  We thought it was...

4    Does that mean 12 minutes have expired?

5              THE COURT:  That means you have 12 minutes left.

6              MR. IMM:  Twelve minutes remaining.  Okay, thank you.

7              THE COURT:  All right, Counsel, I think your...

8              MR. IMM:  Can you go to page 2.

9              So at the bottom of the page here you'll see that Cory

10   was in the top four applicants and that she asked each of the

11   top four applicants about how the swing shift operates, when

12   they would be available to start, and whether they could take

13   the pre-employment physical the following day; again,

14   indicating the plan at that time was to hire all four of these

15   individuals.  She also informed them that she would be running

16   a criminal background check.  Again, not something you do

17   unless you're planning at least to make a conditional offer of

18   employment, and the company's own policies say that.

19             Now, on the next page you'll see exactly as I

20   described.  She asked them if there was anything -- I'm sorry,

21   Diana, can you just highlight that whole paragraph for me,

22   please.

23             She asks, is there anything that she should be aware

24   of regarding Mr. Lange's background, and exactly as I described

25   previously, he responded in the affirmative and told her

1    everything.  Look at that last sentence.  Based upon

2    Mr. Lange's admission, Ms. Petty decided not to extend him an

3    offer; and therefore, did not run the criminal background

4    check.  She's -- the company says that two more times in this

5    position statement, two more times, on page 4, in the

6    second-to-last paragraph.

7            Can you highlight that?  No, above it.

8            Anchor Glass declined to extend an offer to Mr. Lange

9    because he admitted to a conviction for dealing narcotics, and

10   I'm running out of time here, so I'm going to skip over the

11   third example of that.  But they say three times in this

12   position statement that Mr. Lange was not hired for one reason

13   and for one reason only, because he had a criminal conviction.

14           That's it.  That's it, and because of that, as I said,

15   Ms. Petty at that point was done, did not even bother to run a

16   background check on him.  Now, if this company had a policy

17   that said we're not hiring anybody with a criminal record, we

18   wouldn't be here, but they didn't have that policy.

19           At least beginning in 2014, we have evidence that they

20   hired four different people from 2014 up until the time that

21   Cory applied, four different people with felony convictions on

22   their record.  Every one of them was white.  Every one of them

23   was white, and during that same period of time, they didn't

24   hire a single African-American with a criminal conviction, not

25   one.

1    They hired a guy, Ladies and Gentlemen, named Dustin

2    Allen, who denied on his application that he had a criminal

3    record, and he had one as long as your arm.  And they still

4    hired him even when they found out on his background check that

5    he had multiple charges and had lied on his application.  They

6    hired that guy, but he was Caucasian.

7          By the way, nothing against these folks.  You're going

8    to hear from two of them during the course of the trial, Terron

9    Gregg and Eric Gosmeyer.  They're good guys.  At least I think

10   Terron is because I've deposed him.  You're going to hear from

11   both, Gosmeyer.

12         They deserve second chances.  They had a background

13   similar to Cory's.  They deserved the second chances they got,

14   and they made the most of it.  But we're going to prove to you,

15   Ladies and Gentlemen, that Cory deserved it too, and he didn't

16   deserve to be denied that second chance on the basis of his

17   race.

18         Now, it became apparent after 2018, after the company

19   gave its first take, so to speak, on why it wasn't hiring Cory.

20   It soon became apparent that this story was not going to hold

21   up.  It wasn't going to hold up, saying we didn't hire him

22   because of his conviction.  We didn't hire him because of his

23   conviction.  Well, wait a minute.  Your policy had changed.

24   Your policy says we'll look at it on a case-by-case basis.

25   You've got four white guys there with pretty serious criminal

1    backgrounds.

2              Cory had a great interview and presented to you with a

3    great record.  The panel all loved him.  Wait a minute, are you

4    really saying you didn't hire him because he's got a criminal

5    background?  What about all these other guys?  And at that

6    point they had to come up with something different, and boy,

7    did they ever.

8              Three years later they started singing a very

9    different tune, and you're going to hear about that.  First of

10   all, they tried to say that, well, we were only going to hire

11   three people, not four.  That's nowhere in their position

12   statement.  They didn't say that in 2018, and there's no

13   document.  There's no requisition record.  There's no e-mail

14   from somebody at the plant to Katie Petty saying, "We want to

15   hire three people."  Nonsense.

16             They all -- Ms. Petty also tried to say -- and this is

17   under oath, Ladies and Gentlemen.  She also tried to say that

18   she didn't have any knowledge about Cory's race.  That is a

19   lie.  That is an absolute bold-faced lie because she had worked

20   with Brad Lange, Cory's brother.  She knew Cory was Brad

21   Lange's brother, and yet she would go so far as to state under

22   oath in 2021, I didn't even have any understanding of what

23   Cory's race was, but it gets worse.

24             She also says, again, under oath, that I attended most

25   of the interviews, including the interviews of the three guys

*OPENING STATEMENT/IMM*                            Vol. 1-51

1    that were hired, and then I decided I wanted to hire those

2    three guys based on what I saw in their interviews.  And before

3    I ever met Cory, before I ever talked to Cory, rather, I had

4    decided who I was going to hire.

5           The position statement, again, when it was fresh in

6    everyone's mind to this federal agency, the position statement

7    says Katie Petty was out of the office when the interviews were

8    taking place.  So she did not attend any of the interviews, and

9    we don't have any notes of her doing any interviews, so the

10   company goes from, in 2018, saying Katie wasn't at any of the

11   interviews to 2021, because it serves their purpose.

12          They change it drastically and say, no, I was present

13   for almost all the interviews; and, in fact, I made my decision

14   before I ever talked to Cory on the basis of what I saw in

15   those interviews -- those interviews that this company said in

16   2018 she wasn't even at.

17          THE COURT:  Counsel, this is not argument, please.

18          MR. IMM:  Of course.  I'm sorry, Your Honor.

19          And then she says, the real reason I didn't hire Cory

20   was because when I had that phone conversation with him where

21   he told me about the criminal conviction, she says, he said

22   that he would do it again.  He just wouldn't sell to an

23   undercover officer.

24          Ladies and Gentlemen, that's nowhere in the position

25   statement from 2018.  That's nowhere in Ms. Petty's notes from

*OPENING STATEMENT/IMM*                    Vol. 1-52

1   that conversation.  That statement was never made, and it's a

2   lie.  All of these are lies, and they are shameful.  And we

3   will prove to you that they are lies, each and every one of

4   them.

5        So, why did the Defendant change its story?  Well,

6   we're going to prove to you that they changed their story for

7   the same reason that anybody changes a story over time, because

8   they've got something to hide.  We're going to prove that

9   Anchor Glass has something to hide, and they tried very hard to

10  hide it.

11       In 2004, as I mentioned, Cory applied for employment,

12  and on that occasion he lied.  He said in his application he

13  didn't have a criminal record.  That was false, and because it

14  was false, he never passed his probationary period in 2014.

15  But in 2018 he was honest about his criminal record.  They

16  asked him.  It wasn't on his application, but they asked him.

17  And he said, yeah, I was convicted in 2009.  It's a felony.  I

18  went away for three years.

19       He also said on that application that he hadn't worked

20  for the company before because in his mind, he hadn't.  He was

21  there for two weeks.  He never got out of probation.  He wasn't

22  a real employee of the company.  He probably should have asked

23  that -- answered that question differently, but this leads to

24  another falsehood that the Defendant has tried to convey.  And

25  that is that they didn't hire him in 2018 because he said on

1   his 2018 application that he hadn't worked there before.

2          That wasn't any part of the reason that they didn't

3   hire him.  You know how I know that?  Because that's what

4   Anchor Glass said in 2018.  Anchor Glass said in 2018 that they

5   didn't find out about Cory's very brief 2004 employment until

6   they were investigating the EEOC charge.  But in 2021,

7   Ms. Petty tried to claim that she knew about it.

8          THE COURT:  You're under two minutes, Counsel.

9          MR. IMM:  Thank you, Your Honor.

10         So again and again and again, this company has changed

11  its story and will -- it will double down on these

12  misrepresentations and these falsehoods.  During the course of

13  this case, they will take the oath, and they will tell you

14  these same lies that I've just tried to outline for you.  They

15  will twist themselves into knots to convince you that these

16  lies are true.  I'm going to prove that they're not true.

17         I'm not going to be asking you to forgive Cory for the

18  wrongs he committed in his past life, but I am going to prove

19  to you that he deserved a second chance.  I am going to prove

20  to you that he deserved to be treated the same way as Terron

21  Gregg and Eric Gosmeyer and Dustin Allen and Robert Wetzler,

22  and that he was not.

23         And the evidence will convince you, Ladies and

24  Gentlemen.  I will convince you.  I intend to convince you,

25  that at the end of this case you'll be convinced that if every

1    other fact about this case were exactly what it is:  If Cory

2    was still Cory, if Cory still had that record, if Cory had five

3    years of good employment, if Cory had still wowed the

4    interviewers the way that he did, if Cory still had that letter

5    of recommendation, if all of that were true, but he was white,

6    this company would have done exactly what it did for those

7    other four gentlemen.  And it would have hired him, and it

8    would have given him the second chance that he deserved.

9            I am sorry for getting so emotional.  That's wrong of

10   me.  I apologize.  I thank you all very much for your time and

11   attention.

12           THE COURT:  Thank you, Mr. Imm.

13           And, Mr. Murray, you may come up to the lectern.

14           MR. MURRAY:  Thank you, Your Honor.

15                   **OPENING STATEMENT BY**:

16           MR. MURRAY:  Good afternoon.  Thank you again for your

17   time and for your attention and listening to us this afternoon

18   and over the next couple of days.

19           The facts that we're going to show over the next

20   couple of days are different from what you've just heard.  The

21   facts will show this is a case that involves in the spring of

22   2018, Anchor Glass needed to fill three entry-level positions.

23   It received 11 applications for those three positions, and

24   ultimately, only three people out of those 11 were hired.

25           Eight of the 11 applicants were, therefore, given the

1  news their applications hadn't been successful.  Mr. Lange was

2  one of those unsuccessful applications -- applicants.  Most, if

3  not all of those other applicants, were Caucasian who were not

4  successful.

5       This is a case about a disappointed job applicant who

6  can't accept the simple fact that three other applicants were

7  more qualified than he was for the position.  It's also about a

8  job applicant who refuses to accept responsibility for some of

9  the mistakes that he made in the application process.

10      In fact, Mr. Lange was hired by Anchor Glass in 2004.

11 He worked for Anchor Glass for less than two weeks, about 11

12 days.  He was terminated, as you heard, because he had failed

13 to disclose a criminal conviction on his 2004 application.

14 When he sought to be rehired in the spring of 2018, in that

15 application he misrepresented that he had not worked for the

16 company before.

17      There's a question on the first page of the

18 application that asks every applicant, "Have you worked for

19 Anchor Glass before?  And if so, where and when?"  Mr. Lange

20 checked no for that question.

21      Then, during his interview with a human resources

22 employee, he also made a comment about a criminal conviction

23 that he had in 2009, as you heard, for dealing Oxycontin.  In

24 the course of discussing that with the HR employee, he made a

25 comment about something along the lines that if he had done it

again, or he were to do it again he would make sure he wouldn't be dealing with the same person who turned out to be an informant on him in 2009.

Now, the company is willing to hire convicted felons who have paid their dues to society and are seeking to reestablish themselves in a life and a life for themselves. It's perfectly willing to do that, and as you heard, it has hired convicted felons on a number of occasions. The company has a policy under which it looks at criminal records on a case-by-case basis for each person applying.

Maybe Mr. Lange in this case was joking, maybe he was attempting to make light of the situation during the interview when he was discussing this conviction, whatever the reason, we don't know what he intended. It didn't sit well with the HR employee. Finally, and most importantly, Mr. Lange didn't have the same skills, experience, and potential that the other applicants had who were ultimately hired. Therefore, he was included with the eight unsuccessful applicants because there were three better qualified people who were hired.

None of the three people who were hired, none of them, had made misrepresentations on their applications the way Plaintiff did. None of the three people who were hired had criminal convictions about which they made inappropriate comments during their interview the way Mr. Lange did. None of the three people who were hired had previously worked for the

*OPENING STATEMENT/MURRAY*                    Vol. 1-57

1    company as Mr. Lange had, and not made it through their

2    probationary period the way Mr. Lange hadn't.

3           You will hear more about this over the next couple of

4    days.  I wanted to introduce myself again.  Again, my name is

5    Chris Murray.  I'm an attorney at Ogletree Deakins.  My

6    colleague, Ellen Pactor, is also at the table.  You will also

7    see Sam Hijab, who is one of the employees of Anchor Glass.  He

8    is the general counsel for the company.  You also see us

9    talking from time to time with Melissa Couch, who is the

10   paralegal who is assisting us.

11          Anchor Glass, as you can probably imagine, is a

12   company that manufactures glass and glass products.  It makes

13   bottles and jars that are used in the food and beverage

14   industries, and it's based -- or its factory that we're

15   discussing in this case is in Lawrenceburg, down on the Ohio

16   River, not too far from Cincinnati.  The company's

17   headquartered in Tampa, in Florida, where its senior management

18   is located.  It also has several other factories around the

19   country.

20          During the time we'll be talking about, the company

21   had about 280 employees in Lawrenceburg.  About 250 of those

22   employees were involved in manufacturing.  About 30 of those

23   employees were involved in administration or management.  Out

24   of those 250, there were hourly workers, hourly employees

25   working in the process of making glass and glass products, and

1    the production area has multiple areas that you'll hear about.

2         There's the hot-end of the factory.  That's where the

3    glass is made.  The conditions there are extreme.  There's also

4    the cold-end, and that's where after the glass is formed in the

5    bottles and jars, it cools down, it's inspected, and then it's

6    ultimately packed for shipping to the company's own employees

7    -- or to the company's own customers.  This is an extreme

8    environment in this factory because of the heat and because of

9    other circumstances.

10        The factory also runs 24 hours a day.  It's a 24/7

11   operation, and it operates a swing shift that you'll hear

12   about.  That involves an employee working the first shift for

13   seven days and then being off for two days.  Then they move to

14   the second shift, work that for seven days and are off for two

15   days.  And then they move to the third shift, work that for

16   seven days and are off for three days, and then the whole cycle

17   starts over again.

18        It's also a unionized facility.  New employees, new

19   hourly employees, serve a period of time, a probationary

20   period, before they become subject to the union contract.  At

21   this time, it was a 30-day period, and the probationary period

22   allowed both the company and employee the opportunity to see if

23   that employee -- if this was the right person for the job and

24   the right job for the person.  Not everyone can deal with the

25   swing shift.  It's challenging.  The environment in the plant

1    is challenging.  Not everyone can deal with it.

2          Also, during that 30-day probationary period,

3    sometimes the company would receive new information it didn't

4    have; for example, the results of background checks that hadn't

5    been completed fully or drug test results.  And depending on

6    those results, in some cases employees would be let go during

7    the probationary period, just as Mr. Lange had in 2004 when the

8    company discovered that he had a conviction that he had not

9    disclosed.

10          I would like to take a moment now to show you a

11   short -- we've got a short video of what it's like in the

12   plants so you can see it.  You will see in this video, you will

13   see the offices where it's located, the human resources offices

14   and other administrative offices.  From there you will see a

15   display case that shows some of the products that are made at

16   this plant.  Within the plant itself, you will then see,

17   starting from the hot-end, you will see the furnace where the

18   glass is made, and then the molten glass being distributed to

19   various machines in the plant where it's shaped into bottles

20   and jars.  And then finally, through to the cold-end, and then

21   where it's shipped.

22          So, Ms. Couch, if you could please go ahead and play

23   the video, please.

24      (Video playing in open court.)

25          MR. MURRAY:  So that gives you some idea of what

1    happens at the Lawrenceburg plant.  I mentioned that there are

2    different areas within the plant:  The hot-end, the cold-end,

3    and so forth.  There's various categories of hourly employees.

4    The entry-level position in the plant is a position you're

5    going to hear quite a bit about over the next couple of days.

6    It's called selector/packer.

7         That's the, as I mentioned, it's the entry-level

8    position.  It's a position most hourly workers are hired into,

9    and then assuming that the person passes their probationary

10   period and becomes a member of the union, from that position

11   you will have the chance to then bid on other jobs and move up

12   within the plant through the rest of their career at Anchor

13   Glass.

14        So when the company is hiring people for the

15   selector/packer position, they're actually intending and hoping

16   that these people will not stay in that position permanently

17   but that they will actually move up through the bidding process

18   to these other positions in the plant.  That's something that

19   the company looks at when it's interviewing and intending to

20   hire new selector/packers.

21        I mentioned that there's also administrative positions

22   at the plant in Lawrenceburg, and that, of course, includes the

23   plant manager, there's also accounting, and then also human

24   resources.  There is a human resources manager who is

25   responsible for doing all the hiring at the plant.  That

position, over the course of some of the time that we're going to be discussing about in that case, or in this case, human resources manager has changed several times.

Ms. Couch, could you please show Exhibit 264.

It is the human resources manager who I mentioned is responsible for all of the hiring.

I'm sorry, 263.  I apologize.

The human resources manager is the person who collects the applications, reviews the applications, sets up the interviews, and decides who to interview.  This is a timeline from 2004 to 2018.  At the top of that timeline you can see the various human resources managers from the plant.  The first one listed is HR manager Mike Whiting.  Mr. Whiting was the HR manager there for a long time up until July of 2013.

He was then followed, after he retired, by HR manager Liz McMahon.  She's also referred to as Elizabeth McMahon, but you'll hear her mostly referred to as "Liz."  She was there for about four years, from July 2013 to July 2017.

After Ms. McMahon left the company, the HR manager position was actually vacant, and this is the relevant time period when Mr. Lange applied for a job in Lawrenceburg.  The position was vacant because the company was undergoing a hiring freeze. There were some changes going on at the company, and it wasn't doing any new hiring in Lawrenceburg.  So the HR manager position stayed vacant for a while.  That vacancy finally

*OPENING STATEMENT/MURRAY*                    Vol. 1-62

1   ended, and another HR manager was hired in May of 2018, and

2   that's Lindsay Glacken.  And then she remained there until just

3   a couple of months ago.

4       So as you can see, there are a number of HR managers who

5   were involved over this time period, and during the time of the

6   hiring freeze that I mentioned, that period is the most

7   relevant because that's when Mr. Lange applied for a job here.

8       There's another HR position that's called the HR

9   specialist.  That's a clerical administrative position.  The HR

10  specialist reports to the HR manager, and during the time that

11  we'll be talking about, the HR specialist position was held by

12  a lady named Katie Petty.

13      She reported to -- first she reported to Ms. McMahon in the

14  position, and then she reported to Ms. Glacken after she was

15  hired.  You will meet Katie Petty.  Ms. Petty, she's not an

16  employee of the company any longer.  She actually left the

17  company in 2019.

18      What she had -- currently, she is a paraprofessional at an

19  elementary school in Rising Sun, Indiana.  She is a mom.  She

20  has young kids:  Four, seven, and 11.  During the time that was

21  involved here, she had two very young kids at home back in

22  April of 2018.

23      She enjoys working with children at her job at the

24  elementary school, and in particular, she works with kids with

25  special needs because she has a personal interest in that.  You

1    will also hear from Ms. Petty that she comes from a diverse

2    family.  Her own family is diverse.

3        Her brother-in-law is African-American.  Her nephew and her

4    niece are biracial.  You will hear from Ms. Petty that she

5    doesn't think about people using race classifications, and you

6    heard from Mr. Imm that there were some discussion about

7    whether Ms. Petty was conscious of the fact that Mr. Lange,

8    what his race was.  Well, she will explain to you that she

9    doesn't think about those types of things because her own

10   family is multiracial.

11       As I mentioned, Ms. Petty formerly worked at Anchor Glass.

12   She first started in 2011 as a clerk in the accounting

13   department.  She then moved to the HR specialist role in 2014.

14   In that role, she basically did administrative work for the HR

15   manager.  She was not involved in hiring.  She was not involved

16   in interviewing.  She didn't review job applications.  That was

17   all handled by the HR manager.

18       However, when Ms. McMahon left in 2017, Ms. Petty had to

19   cover some of Ms. McMahon's duties as the HR manager.  The

20   company was still doing -- still under a hiring freeze at that

21   time.  So she wasn't doing any hiring of selector/packers, but

22   it was an extremely busy time for Ms. Petty.  Not only was she

23   doing now two jobs, but she also had very young kids at home.

24   And she couldn't -- she had other obligations outside of work.

25   It was an extremely busy time.

*OPENING STATEMENT/MURRAY*                    Vol. 1-64

1        By the spring of 2018, the company allowed Ms. Petty, after

2    this hiring freeze, to hire selector/packers, new

3    selector/packers to replace people who had left.  Several

4    selector/packer positions had come open, and she was authorized

5    by HR in Tampa to fill those positions.  Three positions had

6    come open over the previous prior months, and so she was

7    allowed to hire three people.

8        She did that by contact -- the first thing she did was get

9    applications.  She contacted the local unemployment agency,

10   WorkOne, which collects applications.  They gathered

11   applications, had people fill out applications for Anchor

12   Glass, and forwarded them on to her.  They forwarded her ten

13   applications.

14       Now, as Mr. Imm noted, this is a good job.  These are good

15   jobs at Anchor Glass.  It's a unionized facility.  The pay is

16   good.  The benefits are good.  It's not uncommon for current

17   employees to come forward and say, hey, I hear you're hiring,

18   you know, are you interested in a friend of mine or a relative

19   of mine?  And that happened in this case, too.

20       There was a manager who came forward, I believe it was Liam

21   Curtin, who brought a resumé to Ms. Petty, and it was made for

22   a gentleman named Matt Holmes.  And he was, therefore, included

23   with the applicants.  So Ms. Petty had now ten applicants

24   altogether, ten applications from WorkOne, plus the resumé.

25       In addition, Mr. Lange's brother came to Ms. Petty and

*OPENING STATEMENT/MURRAY*                    Vol. 1-65

1    asked about whether his brother should apply, whether the

2    Plaintiff should apply.  He wondered if his conviction would

3    disqualify him.  Ms. Petty said, no, have him apply.  She

4    wanted everyone to apply.

5        Ms. Couch, if you could please pull up Exhibit 264.  This

6    is a list of the 11 people who applied for the three open

7    positions in 2018:  Ethan Harp, Matt Holmes, Christopher

8    Johnson, Dennis Casto, Christopher Henson, Cory Lange, Jeff

9    Muncy, Bonnie Vice, Angelina Welz, Travis Wilson, and Matthew

10   Wright.

11       Ms. Petty was thus faced with the question of how do I

12   choose out of these 11?  How do I choose the three who are best

13   qualified?  You can see it on this chart.  The three who are

14   shaded green are the people who were ultimately hired, and

15   those shaded red were the ones who were not hired.

16       Ms. Petty looked at their skills, their job history, and

17   thought about whether they had an ability to move upward in the

18   future if they were hired.  She also considered red flags,

19   dishonesty in the application, any prior employment with the

20   company that had not ended favorably.  She also did consider

21   criminal convictions and whether the individuals indicated that

22   they had moved on, had made a change in their life from

23   whatever criminal convictions they might have in their past.

24       Ms. Petty also organized panel interviews.  She had

25   production managers and supervisors from the plant from the

1  different areas interview each of the applicants -- well, all

2  of the applicants but one.  There was an applicant named Bonnie

3  Vice.  She's number eight on this list.  She was not given --

4  she was not given an interview.

5       And, Ms. Couch, if you could please pull up Exhibit 255.

6       This is what the applications look like, and this was

7  Bonnie Vice's application.  It's a little bit difficult to

8  read.  I'm sorry about that.

9       But, Ms. Couch, if you could please focus on the box down

10 below that that asks the question, "Have you ever been employed

11 by the company?"

12      And it's right just below the middle of the page is the

13 question, "Have you ever been employed, or have you ever been

14 employed by Anchor Glass?  Ms. Vice checked yes, and she noted

15 she had been employed from 1997 through 2004.  Ms. Petty

16 decided not to include her in the interviews, and she was the

17 only person out of those 11 who was excluded from the interview

18 process.

19      She wasn't, however, the only person who had previously

20 worked for Anchor Glass out of the 11.  You've already heard

21 that, in fact, Mr. Lange had worked for the company in 2004.

22      Ms. Couch, if you could please call up Exhibit 2000 -- or

23 209.

24      This is Mr. Lange's offer of employment from 2004.  You can

25 see his signature there, and it's dated January 9th, 2004, and

1    it's signed by Mike Whiting, who was the human resources

2    manager there.  It tells Mr. Lange that he's being offered

3    employment.  It's only contingent upon his successfully

4    completing a post-offer physical and drug screen.

5        Ms. Couch, could you please call up 214, and move to the

6    second page, please.

7        This is the HR system at Anchor Glass.

8        If you could please -- sorry.  Thank you.  Oh, there you

9    go.  Is there a second page?  Okay.

10       So this shows that Mr. Lange was previously employed in

11   January of 2004, and his employment lasted for about 11 days.

12   His employment was terminated -- the records show that he

13   failed his probationary period back in 2004.

14       Ms. Couch, could you please pull up Exhibit 314.

15       This is Mr. Lange's application from 2018.  And as you can

16   see where it asks, have you ever been employed by Anchor Glass,

17   he checked no, even though he had, in fact, previously worked

18   for the company and failed his probationary period in 2004.

19       Thank you.  We no longer need that exhibit.  Thank you.

20       After receiving the applications, Ms. Petty organized the

21   panel interviews, and Ms. Petty did, in fact, participate in a

22   number of those interviews, and you will see some of her own

23   notes from those interviews in the coming days.  She is now

24   down to ten applicants, and over the following days they

25   conducted interviews.  They typically lasted about 30 minutes

1    or longer, and after each of the interviews Ms. Petty and

2    whoever the production managers were with her would talk about,

3    well, what do you think of this person?  Yes or no?  Thumbs up

4    or thumbs down?

5        Ms. Petty was unable to participate in a couple of

6    interviews.  She had a conflict, a scheduling conflict that

7    involved employee training.  One of those that she couldn't

8    participate in was Mr. Lange's.  So after she had completed

9    seven or eight of the interviews herself that she sat in on,

10   she and the production managers felt that there were probably

11   three people that they were leaning towards, and she certainly

12   felt that there were three people she was leaning towards:

13   Mr. Johnson, Mr. Harp, and Mr. Holmes.

14       Mr. Johnson had maintenance and warehouse experience,

15   including welding.  Mr. Harp had warehouse experience and

16   vocational training, and Mr. Holmes was actually seeking a

17   bachelor's degree at the time.  Ms. Petty felt that each of

18   these individuals had skills that suggested they would be able

19   to move up out of the selector/packer position, perhaps into

20   maintenance, perhaps into management.

21       There had also been no red flags in any of those three

22   individuals' applications or interviews.  Their interviews had

23   gone well.  There was no inaccurate information that had been

24   discovered in their applications.  No issue -- no prior

25   employment with the company.

1          One of the production managers did ask Ms. Petty to follow
2    up with Mr. Lange.  The committee that interviewed him did like
3    him.  They thought he was interesting, and so one of the
4    managers asked Ms. Petty, said, "Hey, give him a call, and see
5    what you think, as well." So she did.  Ms. Petty agreed to do
6    that.

7          That interview happened sometime towards the end of March
8    of 2018.  She called up Mr. Lange, and she went through the
9    same kinds of questions that she normally asked the other
10   applicants when she was present.  She talked about their work
11   history.  She also talked about the swing shift, because that's
12   a big issue for some people.  It can really change your life,
13   and in the course of discussing the swing shift with Mr. Lange,
14   he actually mentioned, "Oh, I'm familiar with it because I
15   worked here before." Well, that was news to her because he
16   checked no on the application.

17          THE COURT:  Counsel, you have just a little over two
18   minutes.

19          MR. MURRAY:  Thank you, Your Honor.

20          After that discussion, after the phone call, she went
21   and looked at the HR system and saw the record of employment,
22   and that he had only lasted 11 days back in 2004.  That caused
23   her concern.  She also discussed with him, as I mentioned
24   earlier, the criminal conviction he had, and he made this
25   comment that didn't sit well with her and suggested, called

1    into question whether he was truly remorseful for what he had

2    done.  Maybe he was joking, but for whatever reason, it was a

3    red flag for her.

4        After conducting that interview, she talked to Travis

5    Ross, who was the plant manager.  She discussed with him a

6    little bit about, you know, she was having -- she was trying to

7    decide what to do with these applicants, with the applications,

8    and Mr. Ross told her she should exercise her discretion and go

9    ahead and make the decisions that she thought were best, and

10   that's what she did.  She chose three people that she thought

11   were going to be the most successful applicants at the company.

12       On April 3rd, Ms. Petty sent out e-mails, not only to

13   Mr. Lange, but to all of the other applicants who were not

14   successful, letting them know that the company was moving in a

15   different direction.  That same day, she started -- she

16   requested the background checks for the three successful

17   applicants so that they could go ahead and start their process

18   of onboarding.

19       At the end of this process, Ms. Petty had spent about

20   a month reviewing applications, conducting interviews, trying

21   to find the best person for the job.  She selected the three

22   people she thought were best, the people who didn't have any

23   problems in their background, and who had the best skills that

24   the company was looking for.  Mr. Lange just turned out not to

25   be one of the three top choices.  He was one of the eight

1    people who unfortunately was disappointed to find out that they

2    hadn't been successful.

3            We ask this Court -- or we ask the jury please to

4    enter a verdict in favor of Anchor Glass on Mr. Lange's claims

5    of discrimination.  Thank you.

6            THE COURT:  All right.  Thank you, Counsel.

7            All right, Ladies and Gentlemen of the Jury, I'm going

8    to send you home for the evening, and I'm going to give you an

9    admonishment.  During this period of time that you are allowed

10   to separate for overnight, the Court admonishes you that you

11   must not have any discussion about the case among yourselves or

12   with anyone else.

13           What that means is when you get home and you tell your

14   family, "I'm so lucky, I'm on a jury.  I'm on jury duty," and

15   they're going to say, "What's your trial about?"  You may not

16   tell them.  The reason being that if you begin to discuss it

17   with your family and friends, you will begin to form and

18   express opinions about the case, and you're not allowed to do

19   that until you've heard all of -- you haven't heard any

20   evidence so far.  You've just heard the opening statements of

21   counsel, but you're not allowed to have any discussions or make

22   any decisions until you've heard all of the testimony and

23   evidence from the witness stand, you've received the final

24   instructions from the Court, and you've heard the closing

25   arguments of counsel, and you're back in your jury room

1    deliberating.

2        So I know it's common.  It's nature to want to talk about

3    things, but once the trial is over, you can talk about it as

4    much as you would like.  You may not read or watch anything

5    about this matter, and you may not research anything about this

6    matter on -- in any newspapers, television, radio, or Internet.

7    So, Ladies and Gentlemen, that means don't do any Googling

8    about any of the witnesses, the parties, the attorneys, the

9    Anchor Glass corporation, none of that, because once the case

10   is over, you are allowed to do that, but until that time, no

11   research about anything related to the case.  You will receive,

12   as evidence, everything that you need to know about the case,

13   and you'll get that here in the courtroom.

14       If anyone should attempt to talk to you about the matter,

15   refuse and report that attempt to your bailiff at your earliest

16   opportunity.  Under this admonishment you are excused for

17   overnight, and we need you in your jury room at 8:45 a.m.

18       Traffic is always a mess, especially if you're going to get

19   on the interstate, so please leave in plenty of time so that

20   you can be in your jury room at 8:45, because we definitely

21   want to finish by Friday so that you can all have a happy Labor

22   Day without fooling about thinking about coming back here on

23   Tuesday; okay?

24       All right.  Have a very good evening.

25           COURTROOM DEPUTY:  All rise.

1          (Jury out at 5:09.)

2          THE COURT:  All right.  You may be seated.  And,

3   lawyers, the courtroom will be open by 8:00 a.m., and we need

4   you all here by 8:15, okay, in case there's anything we need to

5   talk about before we present with the jury.  That includes you,

6   all right, Mr. Lange?  You get here at 8:15 with your lawyers.

7          Can we get your order of proof for the morning so we

8   know which witnesses you're going to call?

9          MR. IMM:  Yes, Your Honor.  The first witness will be

10  Katie Petty.  The second witness -- the second witness is going

11  to be Mr. Gosmeyer.

12         THE REPORTER:  I'm sorry, I couldn't hear you.  Is

13  your microphone on?

14         MR. IMM:  Oh, I'm sorry.

15         THE REPORTER:  Thank you.

16         MR. IMM:  The second witness will be Mr. Gosmeyer.

17  The third, Brad Lange; the fourth, Travis Ross; the fifth,

18  Terron Gregg.  And if we still have time, Cory Lange.

19         THE COURT:  Okay.  All right.  Have a good evening,

20  everyone, and we'll have the courtroom open for you by

21  8:00 a.m., but make sure you're here at 8:15.  Have a good

22  evening.

23         MR. IMM:  Thank you, Judge.

24         COURTROOM DEPUTY:  All rise.

25         (Proceedings adjourned at 5:11 p.m.)

<u>CERTIFICATE OF COURT REPORTER</u>

    I, David W. Moxley, hereby certify that the foregoing is a true and correct transcript from reported proceedings in the above-entitled matter.


<u>/S/ David W. Moxley</u>                September 25, 2024
DAVID W. MOXLEY, RMR/CRR/CMRS
Official Court Reporter
Southern District of Indiana
Indianapolis Division